# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **JEFFREY SIMMS-BELAIRE**, | Case No. 3:20-cv-338-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **WASHINGTON COUNTY**, **NAPHCARE, INC.**, and **MARTHA ROJO, NP**, | |
| Defendants. | |

Lynn S. Walsh, 610 SW Alder Street, Suite 415, Portland, OR 97205. Of Attorneys for Plaintiff.

John Mansfield, Senior Assistant County Counsel, OFFICE OF WASHINGTON COUNTY COUNSEL, 155 N. First Avenue, Suite 340 MS 24, Hillsboro, OR 97124. Of Attorneys for Defendant Washington County.

George S. Pitcher and Jacqueline E. Houser, LEWIS BRISBOIS BISGAARD & SMITH, LLP, 888 SW Fifth Avenue, Suite 900, Portland, OR 97024. Of Attorneys for Defendants NaphCare, Inc. and Martha Rojo, NP.

**Michael H. Simon, District Judge.**

Plaintiff Jeffrey Simms-Belaire sues Martha Rojo, NP (NP Rojo), NaphCare, Inc. (NaphCare), and Washington County (the County) (collectively, Defendants), alleging that circumstances of his pretrial detention violated his constitutional, statutory, and common law rights. Plaintiff asserts against NP Rojo, NaphCare, and the County claims under 42 U.S.C. § 1983 alleging deliberate indifference to his medical needs in violation of his Fourteenth Amendment rights. Plaintiff also alleges against NaphCare and the County a claim for common law negligence. Finally, against the County, Plaintiff alleges a claim for disability discrimination under Title II of the Americans with Disabilities Act of 1990 (ADA) for violations of 42 U.S.C. § 12132 and § 504 of the Rehabilitation Act of 1973 (Rehabilitation Act), 29 U.S.C. § 794.

NP Rojo and NaphCare move for summary judgment against all claims asserted against them and move to exclude the opinions and testimony of Plaintiff's expert witnesses.[1] The County also moves for summary judgment on all claims against it and joins NP Rojo and NaphCare's motions. The Court thus refers to the pending motions collectively as brought by Defendants. For the reasons below, the Court grants in part and denies in part Defendants' motions to exclude expert testimony and grants in part and denies in part Defendants' motions for summary judgment.[2]

## STANDARDS

### A. *Daubert* Motion to Exclude Expert Testimony

The U.S. Court of Appeals for the Ninth Circuit has discussed the standard under which a district court should consider the admissibility of expert testimony. *See City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036 (9th Cir. 2014). As explained by the Ninth Circuit:

> Rule 702 of the Federal Rules of Evidence provides that expert opinion evidence is admissible if: (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the relevant principles and methods to the facts of the case. Fed. R. Evid. 702.
>
> Under *Daubert* and its progeny, including [*Daubert v. Merrell Dow Pharm.s, Inc.* (*Daubert II*), 43 F.3d 1311 (9th Cir. 1995)], a district court's inquiry into admissibility is a flexible one. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In evaluating proffered expert testimony,

---

[1] In response to NaphCare's motion for summary judgment, Plaintiff concedes his § 1983 claim. Thus, the Court grants this portion of NaphCare's motion.

[2] Notwithstanding the parties' requests for oral argument, the Court does not believe that oral argument would assist in resolving the pending motions. *See* LR 7-1(d)(1).

the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted).

"[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* at 564 (quoting *Daubert* [*v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)]). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 565 (citation and internal quotation marks omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564 (citation omitted). The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969. Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969-70.

The test of reliability is flexible. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc). The court must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance. *Id.; see also Primiano*, 598 F.3d at 564. But these factors are "meant to be helpful, not definitive, and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano*, 598 F.3d at 564 (citations and quotation marks omitted); *see also Barabin*, 740 F.3d at 463. The test "is not the correctness of the expert's conclusions but the soundness of his methodology," and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony. *Primiano*, 598 F.3d at 564-65. Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury.

*Id.* at 1043-44 (case citation alterations added, remaining alterations in original).

"It is the proponent of the expert who has the burden of proving admissibility." *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). Admissibility of the

expert's proposed testimony must be established by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10 (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)). The party presenting the expert must show that the expert's findings are based on sound principles and that they are capable of independent validation. *Daubert II*, 43 F.3d at 1316.

**B. Motion for Summary Judgment**

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

**A. Defendants' Contractual and Employment Relationships**

NaphCare is a medical services provider. Walsh Decl. Ex. 2 (ECF 57-2). The County contracted with NaphCare to provide medical services to individuals incarcerated or detained in the Washington County Jail (the Jail) at the time relevant to this litigation. *See* Walsh Decl. Ex. 3 (ECF 57-3); Walsh Decl. ¶ 5 (ECF 57). NP Rojo was employed by NaphCare and provided

medical care and services at the Jail. *See* Rojo Dep. Tr. at 11:22-24 (Walsh Decl. Ex. 6, ECF 57-6).

## B.  Plaintiff's Pretrial Detention at the Washington County Jail

Plaintiff arrived at the Jail on October 27, 2017, where he was held for about seven months as a pretrial detainee. Simms-Belaire Decl. ¶¶ 3, 9, 10 (ECF 59). Plaintiff is paraplegic and uses a custom wheelchair for mobility. *Id.* ¶ 4. Plaintiff has no feeling in his lower extremities and his medical conditions include bilateral drop-foot, a condition in which the toes on both Plaintiff's feet face downward. *Id.* ¶¶ 4-5. Plaintiff's drop-foot condition requires that he wear footwear that supports his feet, protects his toes from dragging on the ground, and prevents his ankles from rubbing against his metal wheelchair. *See id.* ¶¶ 5, 8.

Before his extradition to Oregon, Plaintiff was housed at the Douglas County Jail in Kansas. *Id.* ¶ 8. There, Plaintiff was provided with low-top Bob Barker brand tennis shoes that featured a thick leather upper trim. *Id.*; *see also* Ex. 1 (ECF 59-1) (photo of substantially similar Bob Barker tennis shoes). According to Plaintiff, the Bob Barker tennis shoes adequately protected Plaintiff's feet and prevented Plaintiff's ankles from rubbing against his metal wheelchair. Simms-Belaire Decl. ¶ 8. While traveling from Kansas to Oregon, and until his arrival at the Jail, Plaintiff wore a pair of personally owned high-top basketball shoes that supported his feet and covered and protected his ankles from injury. *Id.* ¶ 9. Plaintiff notified intake staff upon his arrival at the Jail that he could not wear the standard-issue jail shoes because they would fall off his feet. Intake staff did not issue alternative shoes to Plaintiff at that time. *Id.* ¶ 10

Shortly after his arrival at the Jail, on November 14, 2017, Plaintiff suffered a burn to his left leg resulting from excessively hot water in the Jail's showers. Walsh Decl. Ex. 7 (ECF 57-7 at 32). Plaintiff's medical notes characterized Plaintiff's burn wound as a "[l]arge open area." *Id.*

The next day, November 15th, Plaintiff again suffered burns while in the jail showers. *See, e.g.*, *id.* at 31. After the second shower incident, the burns on his left leg measured around 14 centimeters by 9.3 centimeters and the burns on his right leg measured around 27 centimeters by 14 centimeters. *Id.* at 30. Plaintiff's burns were "blistering" and "open." *Id.* Plaintiff needed treatment again for a new wound on his right knee on December 3, 2017, and Plaintiff's medical notes indicate that Plaintiff could not identify precisely how or when he injured himself. *See id.* at 23 ("[Plaintiff] reported it happened around 6pm but later reports it was likely closer to 7pm . . . . Told pod deputy he thought he had cut his leg or somehow reinjured the old wound causing it to open."). On December 13, 2017, Dr. Julie Radostitz, MD wrote that she reviewed Plaintiff's medical records from "Salt Lake Jail" and noted that Plaintiff "also had second degree burn to thigh while there." *Id.* at 20.

On January 10, 2018, Plaintiff attended a chronic care condition appointment with Dr. Radostitz. In the treatment notes from this visit, Dr. Radostitz states that Plaintiff was "wondering about shoes," and that his "feet drag on ground, worried about losing another toe." *Id.* at 18. Dr. Radostitz elaborated that Plaintiff "[l]ost his [right] 3rd toe due to trauma of feet dragging in wheelchair." *Id*. Regarding Plaintiff's request for shoes, Dr. Radostitz provided Plaintiff with "surgical shoes to protect feet." *Id.*; Simms-Belaire Decl. ¶ 12. Before Plaintiff's request for shoes on January 10th, Plaintiff wore only socks on his feet. Simms-Belaire Decl. ¶ 12. The surgical shoes provided to Plaintiff by Dr. Radostitz were open toed, so they did not address Plaintiff's concerns about his toes dragging on the ground. *Id*. ¶ 13; *see also* Walsh Decl. Ex. 7 at 41 (photo of open-toed surgical shoes). In addition, although Plaintiff tried to wear the surgical shoes, the surgical shoes did not stay on his feet and required him to readjust the shoes every few minutes. Simms-Belaire Decl. ¶ 13.

On March 3, 2018, Plaintiff submitted a medical request to jail staff, writing "[I] have a[n] open sore on my ankle and it[']s swollen." Walsh Decl. Ex. 7 at 1. On March 4th, Plaintiff was seen by Rachel Stickney, RN (RN Stickney), who observed that there were "[s]igns/symptoms" of infection present in Plaintiff's ankle wound. *Id.* at 35-36. On March 5th, NP Rojo saw Plaintiff for a lateral malleolus lesion to his left ankle. *Id.* at 15. Plaintiff told NP Rojo that "his foot has friction against his wheelchair tubing that will continue causing this." *Id.* NP Rojo's treatment notes document that Plaintiff requested "to have his personal shoes/boot type to attempt to prevent this [injury] from re-occurring." *Id.* NP Rojo also noted that Plaintiff "does not wear shoes" and "states that because of his foot drop he cannot wear the regular shoes provided to inmates." *Id.* NP Rojo's treatment plan for Plaintiff states that Plaintiff should "[u]se post-op shoes." *Id.* Plaintiff recalls that he explained to NP Rojo the reasons why he could not wear the surgical shoes, although he could not remember precisely when this conversation occurred. Simms-Belaire Decl. ¶ 14. NP Rojo ordered wound care services for Plaintiff and renewed the wound care order four more times. Walsh Decl. Ex. 7 at 50.

On March 10, 2017, Plaintiff submitted a medical request notifying jail medical staff that his ankle was still "leaking fluids" and that he needed appropriate medical supplies. *Id.* at 2. Plaintiff attended a chronic care appointment with NP Rojo on March 29th, in which NP Rojo noted that because of Plaintiff's "decreased lower extremities sensation, patient is prone to get wounds to his feet and ankles as he hits and scrapes them without noticing until he actually sees blood or someone else tells him." *Id.* at 43. NP Rojo also noted that Plaintiff "currently has a wound resulting from rubbing his left ankle." *Id.*

On April 12, 2018, around six weeks after requesting medical attention for his ankle, Plaintiff submitted a medical request stating "no chang[e to] the situation that caused the wound

[won't] allow it to heal, my open skin on medal [sic] is [not] letting it heal." *Id.* at 4. Two days

later, on April 14th, medical staff responded to this request: "Mr. Simms, a medical nurse is

scheduled to see you to assess your wound. It is not obvious what you are saying 'open skin on

medal.'" *Id.* Plaintiff promptly submitted another message to medical staff, clarifying his

previous message by writing, "my ankle leaning on metal from my wheelchair and has not been

giving accommodations." *Id.* at 6. In response to this message, a medical staff member told

Plaintiff that he was "scheduled to be seen in nurse sick call. You will not know the day or time."

*Id.* Notes from Plaintiff's wound care services on April 15th indicate that Plaintiff reported to

RN Stickney that in the past, "he has been provided with higher medical shoes to protect his

ankles." *Id.* at 51, 54. On April 16th, Plaintiff again reported to NP Rojo that his left ankle

wound was not improving and "that it continues to rub against his wheelchair." *Id.* at 12-13.

NP Rojo observed that Plaintiff's wound was still "open," but was not actively bleeding. *Id.*

at 13. NP Rojo also noted that jail staff had covered Plaintiff's wheelchair tubes with foam

padding. *Id.*

  NP Rojo allowed the order for Plaintiff's wound care services to expire on April 27,

2018. *See id.* at 50. On May 2nd, Plaintiff again requested medical attention for his ankle wound

because "he feels it has not healed." *Id.* at 11. Plaintiff's treatment notes do not indicate that

there was any medical follow-up after Plaintiff's May 2nd request for treatment. *See* Harris Decl.

Ex. 1 (ECF 58-1 at 3).

## C.  Plaintiff's Transfer to the Custody of Oregon Department of Corrections

  Plaintiff was transferred to the custody of the Oregon Department of Corrections

(ODOC) on May 17, 2018. Simms-Belaire Decl. ¶ 18. Upon his arrival at the ODOC facility,

there was "immediate concern" by ODOC staff about the state of Plaintiff's ankle wound. *Id.*

ODOC staff ordered a "wound vac,"[3] took cultures of Plaintiff's wound, ordered x-rays and bloodwork, and provided other wound care. *Id.* Plaintiff's ankle wound did not improve and progressed to a stage IV ulcer. Harris Decl. Ex. 1 at 3.

On July 23, 2018, Plaintiff was transferred and admitted to the Salem Health Emergency Department. *Id.* There, Plaintiff underwent surgical debridement of his left ankle ulcer and wound closure. Plaintiff was ultimately diagnosed with Methicillin-resistant Staphylococcus aureus (MRSA) and osteomyelitis of his left ankle. *Id.*

## DISCUSSION

### A.  Defendants' Evidentiary Objections and *Daubert* Motions to Exclude Expert Testimony

NaphCare and NP Rojo, joined by the County, move pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert*, 509 U.S. 579, and its progeny, to exclude the expert report and testimony of Kristen Harris, NP (NP Harris) in full and Robert Malaer, RN (RN Malaer) in part.

### 1.  Motion to Exclude NP Harris's Testimony and Expert Report

Defendants move to exclude NP Harris's testimony in full on the ground that NP Harris is not qualified to opine as to the standard of care in a jail or correctional setting. In the alternative, Defendants move to exclude NP Harris's expert report to the extent that the report offers evidence that amounts to improper legal conclusions. For the reasons discussed below, the Court denies Defendants' motion to exclude NP Harris' testimony in full but grants Defendants' motion to exclude NP Harris's expert report to the extent that it contains impermissible legal conclusions.

---

[3] Although Plaintiff does not offer evidence elaborating on the precise nature of this treatment, the Court notes, for context only, that a "wound vac" refers to a therapy known as "[v]acuum-assisted closure of a wound." *See Vacuum-Assisted Closure of a Wound*, John Hopkins Medicine, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/vacuumassisted-closure-of-a-wound (last visited January 10, 2024).

### a.  Expert Qualification

A witness may be "qualified as an expert by knowledge, skill, experience, training or education." Fed. R. Evid. 702; *see Primiano*, 598 F.3d at 566. Rule 702 "contemplates a broad conception of expert qualifications" and is "intended to embrace more than a narrow definition of qualified expert." *Thomas v. Newton Int'l Enter.*, 42 F.3d 1266, 1269 (9th Cir. 1994). Thus, a witness may be qualified as an expert upon demonstrating a "*minimal foundation* of knowledge, skill, and experience." *Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) (quoting with emphasis *Thomas v. Newton Int'l Enter.*, 42 F.3d at 1269).

NP Harris is Family Nurse Practitioner who is licensed and credentialed to practice in Oregon, Washington, Montana, and Florida. Harris Decl. Ex. 1 at 1. NP Harris obtained a Bachelor of Science in Nursing from Loma Linda University in 1990 and a Master of Science in Nursing in 1999 from the University of Portland. *Id.* at 9. NP Harris also holds a Master of Business Administration with a specialty in Healthcare Administration. *Id.* at 1. Before becoming a Nurse Practitioner in 1999, NP Harris practiced as a Registered Nurse. She has been board-certified as a Family Nurse Practitioner by the American Nurses Credentialing Center since 2000. NP Harris's professional experience "has been devoted to active clinical practice as a Registered Nurse in a hospital setting as well as a Nurse Practitioner in a clinic and emergency department setting." *Id.* In those settings, NP Harris "actively engaged in the evaluation and treatment of high-risk adults with paraplegia, as well as the diagnosis and treatment of wounds and infection processes." *Id*. NP Harris has spent most of her professional career providing care in the Portland, Oregon metro area. *See id.* at 9-10. NP Harris, however, has no experience providing healthcare in a correctional healthcare facility. Harris Decl. ¶ 5 (ECF 58). NP Harris testified during her deposition that she is not familiar with the National Commission on Correctional Health Care and did not refer to the National Commission on Correctional

Healthcare standards in writing her expert report. Harris Dep. Tr. 33:6-20 (Houser Decl. Ex. 3, ECF 73-3).

The Court is satisfied that NP Harris's long professional experience as a Nurse Practitioner meets the minimum threshold for expert qualification under FRE 702. NP Harris is a licensed and certified nurse practitioner with extensive experience providing care in a variety of settings, including emergency and intensive care. She also has experience providing care and treatment to patients with paraplegia. NP Harris's knowledge and experience relating to the general standard of care for Nurse Practitioners informed her opinion in her report about care provided to Plaintiff by NP Rojo. Because NP Harris is generally qualified to opine as to issues of Plaintiff's care, her lack of specific experience in, or familiarity with, providing care in correctional settings goes to the weight of her testimony, not to its admissibility. *See, e.g.*, *United States v. Little*, 753 F.2d 1420, 1445 (9th Cir. 1984).

The Court finds that, except for the portion of NP Harris's report discussed in the following section, NP Harris's opinions and expert report satisfy the remaining requirements for the admissibility of expert testimony under Rule 702 and *Daubert* and its progeny. NP Harris offers specialized medical knowledge that will help the fact finder to understand the medical evidence and determine facts at issue. NP Harris's opinion is based on sufficient facts and data in the form of a comprehensive review of Plaintiff's medical records and case discovery, and NP Harris applied her extensive medical knowledge and experience to the medical records and case discovery. The methodology employed by NP Harris is widely accepted as a sound and reliable. *See, e.g.*, *Gray v. Khoo*, 2023 WL 4162838, at *7 (E.D. Cal. June 23, 2023) ("Dr. Feinber's specialized expertise, review of the operative pleading, and review of Plaintiff's medical records render his opinions both admissible and probative because based on

scientifically valid principles and resting on a reliable foundation relevant to the task at hand.");

*Scott v. United States ex rel. U.S. Airforce*, 2023 WL 2914283, *12 (S.D. Ill. Apr. 12, 2023)

("Dr. Albers reviewed Scott's medical records along with other discovery in this case. It appears

that she applied her many years of experience and education in the medical field, as well as her

specific experience treating conditions like Scott's, to reach her conclusions and assess injury

and its cause. This is widely accepted as a sound and reliable methodology."); *Ransom v.*

*Herrera*, 2019 WL 3996479, at *7 (E.D. Cal. Aug. 23, 2019) ("A physician may base his

opinions on medical records and experience/training.").

### b. Impermissible Legal Conclusions

Defendants move to exclude NP Harris's report to the extent that it contains

impermissible legal conclusions. Defendants point to a sentence in NP Harris's report in which

she states that the care provided to Plaintiff "violates the standard of care and *shows complete*

*indifference to [Plaintiff's] high-risk status and accommodation request*." Harris Decl. Ex. 1 at 7

(emphasis added). Defendants argue that the italicized phrase amounts to an impermissible legal

conclusion and should be excluded on that ground.

Rule 702(a) requires that expert testimony will "help the trier of fact to understand the

evidence or to determine a fact in issue," and Rule 704(a) clarifies that an "opinion is not

objectionable just because it embraces an ultimate issue." "Consistent with Rule 704(a), [the

Ninth Circuit] has repeatedly affirmed that an expert witness cannot give 'an opinion as to her

*legal conclusion*, i.e., an opinion on an ultimate issue of law.'" *United States v. Diaz*, 876

F.3d 1194, 1197 (9th Cir. 2017) (quoting *Hangarter*, 373 F.3d at 1016) (emphasis in *Hangarter*).

The "prohibition of opinion testimony on an ultimate issue of law recognizes that, when an

expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a

decision, but rather attempts to substitute the expert's judgment for the jury's." *Id.* (quotation

marks omitted) (emphasis in original). Generally, courts hold that an expert opinion that a person acted with deliberate indifference is an impermissible legal conclusion. *See, e.g.*, *Davis v. Wash. State Dept. of Soc. & Health Servs.*, 2018 WL 6251375, at *6 (E.D. Wash. Nov. 29, 2018) (collecting cases); *M.H. v. County of Alameda*, 2015 WL 54400, at *2 (N.D. Cal. Jan. 2, 2015) (collecting cases); *Wright v. Washington*, 2010 WL 2747257, at *5 (W.D. Wash. July 9, 2010); *Wiley v. Dept. of Educ.*, 2008 WL 4225846, at *1 (D. Haw. Sept. 11, 2008). Exclusion is appropriate even when the expert does not use the phrase "deliberate indifference," and instead uses similar phrases like "total indifference" or merely "indifference." *Nate v. Finley*, 505 F. Supp. 3d 635, 639-40 (W.D. La. 2020) (finding that the use of the phrases "total indifference," "indifference to serious medical needs," and "reckless disregard," in an expert's opinion were legal conclusions about the conduct at issue in a § 1983 and medical negligence action); *Quagliarello v. Dewees*, 802 F. Supp. 2d 620, 625 (E.D. Penn. 2011) (excluding expert testimony on "whether the City showed 'indifference.'").

The Court therefore agrees with Defendants that the portion of NP Harris's report stating that the care Plaintiff received from NP Rojo "shows complete indifference to his high-risk status and accommodation request" is impermissible expert testimony because it amounts to a legal conclusion. This opinion evidence encroaches on the jury's province to determine the deliberate indifference element of Plaintiff's claims.

### c.  Conclusion

The Court denies Defendants' motion to exclude NP Harris's report and testimony in full. The Court finds that NP Harris is qualified under Rule 702 of the Federal Rules of Evidence. The Court grants Defendants' alternative motion to exclude the statement in NP Harris's report that the care provided to Plaintiff "shows complete indifference to [Plaintiff's] high-risk status and accommodation request" because that statement is an impermissible legal conclusion. NP Harris

may, however, opine as to the generally applicable standard of care of a nurse practitioner and whether NP Rojo's conduct met that standard of care. *See, e.g.*, *Berra v. Lyons*, 2014 WL 585008, at *14 (E.D. Wash. Feb. 14, 2014) ("In order to avoid invading the province of the jury, both experts should confine their testimony to the issue of whether Defendants' conduct was *consistent with prevailing standards* . . . ." (collecting cases) (emphasis in original)).

### 2. Motion to Exclude RN Malaer's Testimony and Expert Report

As with NP Harris's testimony, Defendants move to exclude RN Malaer's testimony and expert report to the extent that RN Malaer offers opinions amounting to impermissible legal conclusions or involves matters to which he is unqualified to testify. Defendants point to instances in RN Malear's report in which he opines about Defendants' "deliberate indifference" and the "neglectful" care to Plaintiff, *see generally* Houser Decl. Ex. 2 (ECF 73-2), and argue that these opinions amount to legal conclusions that RN Malaer is not qualified to provide. Plaintiff concedes that RN Malaer should refrain from using terms such as "deliberate indifference" and "negligence" in his trial testimony but argues that there is no need to strike any portion of RN Malaer's report because it has not been offered as evidence in opposition to the pending motions for summary judgment.

The Court declines to reach Defendants' motion to exclude RN Malaer's expert testimony because it is not being offered in support of Plaintiff's opposition to Defendants' various summary judgment motions. If Plaintiff discloses RN Malaer as an expert witness for trial, then Defendants may renew their motion as a motion in limine. The Court therefore denies as premature Defendants' motion to exclude in part RN Malaer's expert testimony and report without prejudice.

## B. Defendants' Motions for Summary Judgment

### 1. Disability Discrimination Claims

Plaintiff's first claim for relief alleges that the County violated the ADA and the Rehabilitation Act. The County moves for summary judgment in its favor on that claim.[4]

### a. Applicable Law

Title II of the ADA was expressly modeled after § 504 of the Rehabilitation Act, and the Ninth Circuit has observed that "there is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act." *Pierce v. County of Orange*, 526 F.3d 1190, 1216 n.27 (9th Cir. 2008) (cleaned up); *see also T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 467 (9th Cir. 2015) ("The language of the ADA is almost identical [to § 504 of the Rehabilitation Act], and courts typically analyze the two provisions together."). To establish a claim under Title II of the ADA or § 504 of the Rehabilitation Act, a plaintiff must show:

> (1) [H]e is a qualified individual with a disability; (2) (for the ADA claim) he was denied a reasonable accommodation that he needs in order to enjoy meaningful access to the benefits of public services; and (3) the program providing the benefit receives federal financial assistance (for the Rehabilitation Act claim) or is a public entity.

---

[4] Plaintiff brings to the Court's attention that counsel for the County failed to confer with Plaintiff's counsel in violation of Local Rule 7-1(a). Plaintiff is correct that the Court may deny any motion that fails to meet this conferral requirement. LR 7-1(a)(3). Counsel for the County admits that counsel failed to meet and confer before moving for summary judgment and accepts full responsibility for this failure, expressing that the omission was inadvertent. Counsel belatedly conferred on all claims, and because of this conferral, the County withdrew its argument that Plaintiff failed to exhaust administrative remedies as required by the Prison Litigation Reform Act of 1995. The Court acknowledges the belated conferral and appreciates the County's attorney's acceptance of responsibility. The Court's response to a lack of conferral is discretionary and the Court declines to dismiss the motion on this procedural ground under these circumstances. The Court reminds all parties, however, that compliance with LR 7-1's conferral requirement is not optional and that future failure to comply may result in denial of the violative motion.

*Csutoras v. Paradise High Sch.*, 12 F.4th 960, 968-69 (9th Cir. 2021) (cleaned up).

*Respondeat superior* liability applies to claims under both the Rehabilitation Act and Title II of the ADA. *See United States v. Town of Colorado City*, 935 F.3d 804, 809 (9th Cir. 2019) (citing *Duvall v. County of Kitsap*, 260 F.3d 1124, 1141 (9th Cir. 2001) (ADA) and *Bonner v. Lewis*, 857 F.2d 559, 567 (9th Cir. 1988) (Rehabilitation Act)). The Ninth Circuit has also confirmed that liability extends to government entities for violations of the ADA and Rehabilitation Act committed by prison services contractors. *See Castle v. Eurofresh, Inc.*, 731 F.3d 901, 911 (9th Cir. 2013) ("The law is clear—the State Defendants may not contract away their obligation to comply with federal discrimination laws.").

To recover monetary damages under the ADA or the Rehabilitation Act, a plaintiff must "clear an additional hurdle" and establish intentional discrimination by state officials. *Csutoras*, 12 F.4th at 969; *see also Ferguson v. City of Phoenix,* 157 F.3d 668, 674 (9th Cir. 1998) (holding that "compensatory damages are not available under Title II [of the ADA] or § 504 [of the Rehabilitation Act] absent a showing of discriminatory intent."). In determining whether a defendant acted with intentional discrimination towards a plaintiff because of his or her disability, the Ninth Circuit applies the "deliberate indifference" standard. *Duvall*, 260 F.3d at 1138. "Deliberate indifference requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon that the likelihood." *Id.* at 1139. When a plaintiff "has alerted the public entity to his need for accommodation (or where the need for accommodation is obvious, or required by statute or regulation), the public entity is on notice that an accommodation is required, and the plaintiff has satisfied the first element of the deliberate indifference test." *Updike v. Multnomah County*, 870 F.3d 939, 951 (9th Cir. 2017) (quotation marks omitted). The second element is satisfied if the entity's "failure to act [is] a

result of conduct that is more than negligent, and involves an element of deliberateness."
*Duvall*, 260 F.3d at 1139.

### b. Analysis

Plaintiff alleges that the County violated his rights under the ADA and the Rehabilitation Act by failing to provide Plaintiff with reasonable accommodations and equal access to programs, activities, services, and other opportunities. Plaintiff also alleges that the County failed to enforce appropriate policies related to inmates with disabilities and failed to train and supervise jail personnel to ensure appropriate compliance with ADA protections. Plaintiff argues that, through the County's deliberate indifference to his need for accommodation and the denial to Plaintiff the rights and benefits afforded to other inmates, the County intentionally discriminated against him solely by reason of his disability in violation of the protections afforded to him under the ADA and the Rehabilitation Act.

The County's only argument at summary judgment is that Plaintiff does not offer evidence to establish Plaintiff's entitlement to money damages under the deliberate indifference standard. The County does not challenge any other aspect of Plaintiff's claim. Thus, the Court considers only the two prongs of the deliberate indifference test—knowledge, based on notice, and failure to act involving an element of deliberateness.

### i. Notice

The County argues that Plaintiff did not make an oral request for a personal footwear accommodation to the Jail's ADA coordinators or jail staff. The notice element of the deliberate indifference test under the ADA and Rehabilitation Act, however, is satisfied when the plaintiff has alerted the public entity to his need for accommodation, "or where the need for accommodation is *obvious*, or *required* by statute or regulation." *Csutoras*, 12 F.4th at 969 (emphases in original).

PAGE 17 – OPINION AND ORDER

Plaintiff offers evidence that upon his arrival at the Jail, Plaintiff notified intake staff that he could not wear standard-issued jail shoes because they fall off his feet and that he "need[ed] shoes." Simms-Belaire Decl. ¶ 10. The Jail's intake staff did not offer any accommodation to Plaintiff at that time. *Id.* Plaintiff specifically asked NaphCare medical staff about shoes that would protect his feet and ankles, and medical staff documented these repeated requests in Plaintiff's medical records. *See, e.g.*, Walsh Decl. Ex. 7 at 15, 18. Plaintiff testified in his deposition that when he was denied a footwear accommodation from NaphCare, he spoke to an "ADA lady" whose name Plaintiff could not remember, but who "was a corporal," about his request for shoes. Simms-Belaire Dep. Tr. at 121:8-122:6 (Walsh Decl. Ex. 9, ECF 57-9). Plaintiff testified that the corporal "who deals with all the ADA stuff" denied his request and said that he "had to go through medical." *Id.* at 122:2-10.

Setting aside Plaintiff's repeated requests for accommodation, Plaintiff's need for a footwear accommodation was obvious. Plaintiff is in a wheelchair and has a visually apparent physical condition that causes his feet to point downward, causing standard-issue jail shoes and surgical shoes to slip off his feet. Because Plaintiff lacked suitable footwear that addressed his disability, Plaintiff wore only socks on his feet for much of his time in the Jail—a fact documented by medical staff in Plaintiff's medical records. Walsh Decl. Ex. 7 at 15. His condition also caused wounds on Plaintiff's ankle that would not heal, an obvious condition. Viewing the evidence in the light most favorable to Plaintiff shows that Plaintiff not only expressly notified Jail and NaphCare medical staff of his need for a footwear accommodation, but Plaintiff's need for an accommodation also was obvious.[5]

---

[5] Plaintiff alleges that, because of the lack of footwear accommodation and the subsequent injury to his ankle, he was denied recreational opportunities and other benefits while at the Jail. Within its discussion of deliberate indifference under the ADA, the County's motion

Plaintiff repeatedly notified the Jail's medical staff of his need for medical treatment for the injury caused by his wheelchair due to his lack of adequate footwear. *See, e.g.*, *id.* at 1, 2, 4, 6, 13. The need for an adequate medical accommodation was also obvious, as Plaintiff suffered from an open wound that did not heal and that was exacerbated by the lack of suitable footwear to prevent his ankle from rubbing against his wheelchair. Viewed in the light most favorable to Plaintiff, sufficient evidence exists for a factfinder to find that the County's agents were on notice that Plaintiff required accommodation and access to medical treatment by reason of his disability.

### ii.  Failure to Act

The County argues that because the Jail's staff offered Plaintiff surgical shoes as an accommodation to standard-issued jail shoes and treated Plaintiff's ankle wound, Plaintiff cannot establish that the County failed to act. Therefore, according to the County, Plaintiff's disability discrimination claim fails on the second element of the deliberate indifference test. Plaintiff argues that the County had an affirmative obligation to conduct a reasonable investigation upon receipt of Plaintiff's request for accommodation, and that the County's failure to conduct such an investigation establishes the "failure to act" element of the deliberate indifference test.

---

states that Plaintiff fails to offer evidence of denial of access to the recreational yard. The County fails to explain why it raises this argument in the context of the deliberate indifference test. The Court construes that the County may be making an argument that Plaintiff failed to notify staff that he was denied meaningful access to recreational activities. This argument, however, presumes that the ADA and Rehabilitation Act's deliberate indifference test requires notice of each element of Plaintiff's claims under those statutes. Plaintiff needs only to show that the County had notice of Plaintiff's need for reasonable accommodation to fulfill the knowledge element of the deliberate indifference test. *See Updike*, 870 F.3d at 951. Plaintiff alleges that the denial of recreational opportunities and other benefits was the *result* of a lack of an accommodation (and offers adequate evidence in support of this allegation to create a triable issue, *see* Simms-Belaire Decl. ¶ 16). Thus, Plaintiff did not need to make another showing of notice beyond the notice of his need for accommodation.

It is "well-settled" that the ADA and the Rehabilitation Act "create a duty to gather sufficient information from the disabled individual and qualified experts as needed to determine what accommodations are necessary." *Updike*, 870 F.3d at 954 (cleaned up). A public entity does not satisfy the strictures of the ADA and Rehabilitation Act by "proffering just any accommodation: it must consider the particular individual's need when conducting its investigation into what accommodations are reasonable." *Duvall*, 260 F.3d at 1139 (footnote omitted). This is especially true "when the accommodation is provided based upon stereotyped assumptions about the person's disability, such as the assumption that all hearing-impaired individuals need sign-language interpreters." *Id*. at 1139 n.14. For claim under the ADA or Rehabilitation Act, "[a] denial of a request without investigation is sufficient to survive summary judgment on the question of deliberate indifference." *Updike*, 870 F.3d at 954.

The Court agrees with Plaintiff that the County had an affirmative duty to investigate Plaintiff's requests for a footwear accommodation. Plaintiff repeatedly notified various intake and medical staff about his request for a reasonable and adequate alternative footwear accommodation. Not until more than two months after Plaintiff's first request for alternative shoes did medical staff offer an accommodation: surgical shoes. In offering surgical shoes as an accommodation, medical staff failed to consider Plaintiff's specific needs. The surgical shoes did not address Plaintiff's concerns about protecting his toes and did not prevent his ankles from rubbing against the metal of his wheelchair. The assumption by jail staff that Plaintiff's request for a footwear accommodation would be satisfied by a surgical shoe accommodation is analogous to the impermissible assumption that "all hearing-impaired individuals need sign-language interpreters." *Duvall*, at 1139 n.14. Thus, Plaintiff's evidence creates a genuine issue of

fact as to whether the Jail's medical staff failed to conduct a legally sufficient investigation into the reasonableness of the footwear accommodation provided to Plaintiff.

In the context of Plaintiff's ADA claim for the denial of medical services, the County correctly points out that inadequate medical care does not provide a cognizable claim under the ADA. *See, e.g.*, *Kauffman v. Rynning (Prison)*, 2023 WL 5624690, at *6 (D. Ariz. Aug. 23, 2023) (collecting cases); *Galvin v. Cook*, 2000 WL 1520231 (D. Or. Oct. 3, 2000) ("The ADA and Rehabilitation Act afford disabled persons legal rights regarding access to programs and activities enjoyed by all, but does not provide them with a general federal cause of action for challenging the medical treatment of their underlying disabilities."). "When the decision being challenged is 'simply a reasoned medical judgment with which the patient disagreed,' it is more appropriate for the patient to turn to 'state medical malpractice law, not [the ADA].'" *Kiman v. New Hampshire Dept. of Corr.*, 451 F.3d 274, 285 (1st Cir. 2006) (quoting *Lesley v. Chie*, 250 F.3d 47, 58 (1st Cir. 2001) (alteration in *Kiman*). Access to prescribed medication, on the other hand, is part of a prison's medical services and "thus is one of the 'services, programs, or activities' covered by the ADA." *Id.* at 286-87 (quoting *United States v. Georgia*, 546 U.S. 151, 157 (2006)). When a prison fails to provide prescribed medication to a prisoner, that failure is not "a medical judgment subject to differing opinions—it is an outright denial of medical services" that may provide the basis for a claim under the ADA. *See id.* at 287.

NP Rojo prescribed wound care services[6] for Plaintiff's ankle starting on March 5, 2018. Walsh Decl. Ex. 7 at 50. Plaintiff received intermittent wound care treatment until the wound care prescription expired on April 27, 2018. *Id.* Plaintiff's wound care order was allowed to

---

[6] The Court is satisfied that Plaintiff's prescribed wound care treatment is sufficiently analogous to the prescribed medication in *Kimon* and applies this persuasive authority.

expire despite medical staff repeatedly documenting that Plaintiff's ankle wound was "chronic" in his medical records. *See generally*, Walsh Decl. Ex. 11 (ECF 57-11) (Plaintiff's wound care treatment notes). On May 2, 2018, after wound care services were discontinued, Plaintiff notified NaphCare medical staff that he would "like to be seen regarding [the] wound on [his] foot," because "he feels that it has not healed." Walsh Decl. Ex. 7 at 11. No documentation in Plaintiff's medical records indicates that Plaintiff received any wound care or follow-up treatment in response to his May 2nd request. *See* Harris Decl. Ex. 1 at 3.

Evidence that medical staff prescribed, and Plaintiff received, wound care treatment between March 5th and April 27th contradicts Plaintiff's claim that he was denied medical services during that period in violation of the ADA and Rehabilitation Act. The Court concludes that, for that period, Plaintiff does not provide sufficient evidence to defeat summary judgment on his ADA and Rehabilitation Act claim for the denial of medical services. Instead, the evidence from that period demonstrates that Plaintiff disagreed with "reasoned medical judgment" about his treatment.

After the date that Plaintiff's prescribed wound care expired, however, the evidence, when viewed in the light most favorable to Plaintiff, sufficiently creates a factual dispute about whether Plaintiff was denied medical services in violation of the ADA and Rehabilitation Act. Plaintiff notified medical staff of his continuing need for wound care services. Apart from Plaintiff's express notification, medical staff had treated Plaintiff's "chronic" ankle injury for almost two full months by the time that the prescribed wound care services expired; this evidence could establish that Plaintiff's need for continued wound care also was obvious. Because there is no evidence that his wound healed and no evidence that wound care services were provided to Plaintiff at any point after April 27th, there is a triable issue as to whether

Plaintiff was denied medical services in violation of the ADA for the period after April 27, 2018 until his transfer on May 17, 2018, to the custody of ODOC, where he promptly received significant wound care services.

### c.  Conclusion

A triable issue exists as to whether the County was deliberately indifferent in its denial of a reasonable footwear accommodation for Plaintiff. Because Plaintiff cannot raise facts sufficient to show that the County's agents denied Plaintiff access to medical services between March 5, 2018 and April 27, 2018, the Court grants partial summary judgment in the County's favor on Plaintiff's ADA and Rehabilitation Act claim for denial of medical services for that period. The Court, however, finds that genuine issues of fact preclude summary judgment in the County's favor on Plaintiff's ADA claim for denial of medical services from April 27, 2018 to May 17, 2018.

### 2.  Deliberate Indifference to Medical Needs

Plaintiff asserts a claim under § 1983 against NP Rojo, alleging that NP Rojo's conduct was deliberately indifferent to the serious medical needs of Plaintiff in violation of Plaintiff's right to due process under the Fourteenth Amendment.

### a.  Applicable Law

"[C]laims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard." *Gordon v. County of Orange* (*Gordon I*), 888 F.3d 1118, 1124-25 (9th Cir. 2018) (quotation marks omitted); *see also Castro v. County of Los Angeles*, 833 F.3d 1060, 1067-68 (9th Cir. 2016) (contrasting the "deliberate indifference" tests under the Eighth and Fourteenth Amendments). Under the objective deliberate indifference standard,

> [P]retrial detainees alleging that jail officials failed to provide
> constitutionally adequate medical care must show:
>
> (1) The defendant made an intentional decision with respect to the
> conditions under which the plaintiff was confined [including a
> decision with respect to medical treatment];
>
> (2) Those conditions put the plaintiff at substantial risk of suffering
> serious harm;
>
> (3) The defendant did not take reasonable available measures to
> abate that risk, even though a reasonable official in the
> circumstances would have appreciated the high degree of risk
> involved—making the consequences of the defendant's conduct
> obvious; and
>
> (4) By not taking such measures, the defendant caused the
> plaintiff's injuries.

*Sandoval v. County of San Diego*, 985 F.3d 657, 669 (9th Cir. 2021) (alteration in original)

(quoting *Gordon I*, 888 F.3d at 1125). "To satisfy the third element, the plaintiff must show that

the defendant's actions were 'objectively unreasonable,' which requires a showing of 'more than

negligence but less than subjective intent—something akin to reckless disregard.'" *Id.* (quoting

*Gordon I*, 888 F.3d at 1125). "[O]bjective reasonableness turns on the facts and circumstances of

each particular case," with reference to what the defendant "knew at the time, not with the 20/20

vision of hindsight." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (quotation marks

omitted).

"The 'reckless disregard' standard is a formidable one." *Fraihat v. U.S. Immigr. &*

*Customs Enf't*, 16 F.4th 613, 636 (9th Cir. 2021).

> Neither mere lack of due care, nor an inadvertent failure to provide
> adequate medical care, nor even medical malpractice, without
> more, is sufficient to meet this standard. Instead, a plaintiff must
> show that the defendant disregarded an excessive risk to the
> plaintiff's health and safety by failing to take reasonable and
> available measures that could have eliminated that risk.

*Id.* (cleaned up). In other words, "although medical negligence is not by itself unconstitutional, the care rendered can be so inadequate to the circumstances known to the medical staff as to amount to deliberate indifference." *Russell v. Lumitap*, 31 F.4th 729, 741 (9th Cir. 2022).

### b. Analysis

Plaintiff alleges that NP Rojo was deliberately indifferent to his constitutional rights under the Fourteenth Amendment by failing to provide constitutionally adequate medical care, failing to protect his ankle from further injury, and ignoring his requests for medical attention for his ankle wound. NP Rojo argues that summary judgment in her favor is warranted because first, Plaintiff cannot meet the standard for showing that NP Rojo acted with deliberate indifference, and second, Plaintiff cannot show NP Rojo's conduct put Plaintiff at substantial risk of suffering serious harm.

NP Rojo characterizes Plaintiff's claim as a mere disagreement with medical staff's treatment plan. NP Rojo argues that a difference of medical opinion is insufficient as a matter of law to establish deliberate indifference, citing *Toguchi v. Chung*, 391 F.3d 1051, 1067 (9th Cir. 2004). *Toguchi*, however, analyzed deliberate indifference under the Eighth Amendment, not the Fourteenth Amendment. In the wake of the Supreme Court's decision in *Kingsley*, the Ninth Circuit noted that *Toguchi* and similar cases "are of limited relevance" to Fourteenth Amendment claims because they apply the Eighth Amendment's subjective deliberate indifference standard rather than the objective deliberate indifference standard of the Fourteenth Amendment. *Sandoval*, 985 F.3d at 670-71. The Ninth Circuit also clarified that "even under the Eighth Amendment standard, a defendant can be held liable for actions that were medically unacceptable under the circumstances." *Id.* at 671 (cleaned up). The Court thus does not apply to its analysis of deliberate indifference under the Fourteenth Amendment the legal rule advocated for by NP Rojo.

PAGE 25 – OPINION AND ORDER

Viewed in the light most favorable to Plaintiff, the record presents a genuine dispute of material fact as to whether NP Rojo was deliberately indifferent to Plaintiff's medical needs. As to the first element of the deliberate indifference test, the parties do not dispute that NP Rojo made many intentional decisions about Plaintiff's medical care and treatment. NP Rojo met with Plaintiff on March 5, 2018 to assess Plaintiff's ankle wound. Walsh Decl. Ex. 7 at 15-16. In NP Rojo's treatment notes from that encounter, she observed that Plaintiff asked for personal shoes or boots to prevent his ankle wound from reopening and that Plaintiff stated that his foot drop prevented him from wearing regular footwear provided to inmates. NP Rojo concluded, however, that Plaintiff's personal shoes were not allowed and that she recommended Plaintiff wear approved "post-op" shoes. *Id.* at 16. NP Rojo did not refer Plaintiff's request for medically appropriate shoes to the NaphCare medical director, as required by the Aids to Impairment policy. Rojo Dep. Tr. at 63:10-64:3; *see also* Walsh Decl. Ex. 7 at 7 (Aids to Impairment Policy) ("Inmate requests for prostheses, orthoses, or other aids to impairment will be referred for evaluation and approval by the Medical Director and corporate Utilization Management Nurse."). Despite Plaintiff's ankle injury persisting, NP Rojo allowed Plaintiff's order for wound care to terminate on April 27th. Walsh Decl. Ex. 7 at 50.

As to the second element, NP Rojo argues that no evidence can establish that her actions exposed Plaintiff to a substantial risk of suffering serious harm. The Court disagrees. Plaintiff is paraplegic with a medical history of injury to his lower extremities so serious that a past injury resulted in amputation. *See* Walsh Decl. Ex. 7 at 18; Simms-Belaire Decl. ¶ 6. While detained at the Jail, Plaintiff twice suffered severe burns to his lower body when he was scalded by excessively hot water in the shower. Walsh Decl. Ex. 7 at 31-32. On March 29th, NP Rojo observed that Plaintiff "is prone to get wounds to his feet and ankles as he hits and scrapes them

without noticing." *Id.* at 43. This evidence could establish that the absence of proper treatment created a substantial risk of harm to Plaintiff. That risk of harm could be as, if not more, serious than the harm that already occurred. Evidence that Plaintiff suffered serious harm when the wound became infected with MRSA and required surgical treatment reinforces that a rational jury could find this element of the test satisfied. Sufficient evidence exists to create a triable dispute over whether NP Rojo's actions put Plaintiff at substantial risk of serious harm.

For the third element, NP Rojo argues that there is no admissible evidence that NP Rojo failed to take reasonable available measures to abate the substantial risk of serious harm. NP Rojo reasons that her prescribed course of treatment was medically acceptable under the circumstances and there is no evidence that the performance of any additional tests would have resulted in a different outcome. Plaintiff offers evidence from his expert, NP Harris, that the medically acceptable standard of care under the circumstances required NP Rojo to "consider infection as a differential diagnosis, adequately treat and document wound care, provide oral antibiotics, prevent additional friction injury, provide protective shoes, and secure an appropriate and timely follow-up plan."[7] Harris Decl. Ex. 1 at 8. That these measures were reasonably available to NP Rojo is supported by evidence that as soon as Plaintiff was transferred to the custody of ODOC, medical staff put Plaintiff on a wound vac, took a culture of the wound, ordered x-rays and bloodwork, and provided other wound care. Simms-Belaire Decl. ¶ 18. There is sufficient evidence for a factfinder to determine that NP Rojo "disregarded an excessive risk to

---

[7] NP Rojo replies that NP Kristen Harris's expert testimony is inadmissible because NP Harris has not worked in a correctional facility and has no expertise in wound care. NP Rojo refers to her *Daubert* motion to exclude Plaintiff's experts, filed concurrently with NP Rojo's and NaphCare's motion for summary judgment. This argument is not persuasive. First, NP Rojo's *Daubert* motion makes no mention of NP Harris's wound care expertise or lack thereof. Second, for the reasons discussed above, the Court denies NaphCare's and RN Rojo's motion to exclude RN Harris's expert testimony.

the plaintiff's health and safety by failing to take reasonable and available measures that could have eliminated that risk." *See Fraihat*, 16 F.4th at 636 (cleaned up).

Finally, as to the causation element of the deliberate indifference analysis, NP Harris offers her opinion that "[n]ot protecting Mr. Simms-Belaire and not treating his left ankle caused his left ankle dangerous infection, subsequent development of ulcer, surgical intervention, long-term antibiotics as well as the pain and suffering Mr. Simms-Belaire experienced." Harris Decl. Ex. 1 at 7. Thus, a genuine issue of material fact exists as to the final element in the deliberate indifference analysis.

Because Plaintiff offers evidence sufficient to show that genuine issues of fact exist as to each required element under the deliberate indifference analysis, the Court denies summary judgment in NP Rojo's favor on Plaintiff's fourth claim for relief.

### 3.  Section 1983 *Monell* Claim Against the County

Plaintiff asserts a § 1983 *Monell* claim against the County. Plaintiff alleges *Monell* liability under theories that the County: (1) failed to implement or enforce adequate policies and procedures for disabled inmates; (2) had a policy or procedure that denied disabled inmates the ability to wear hi-top sneakers; (3) had a policy or procedure that denied disabled inmates special needs items like footwear; and (4) failed to train its employees regarding the needs of disabled individuals. Plaintiff contends that the County's failure to act led to the violation of Plaintiff's Fourteenth Amendment rights while he was at the Jail.[8]

---

[8] In his response brief, Plaintiff concedes that based on evidence obtained in discovery, his claims based on the County's alleged affirmative policies have been dropped and he is only pursing his omissions-based claims. ECF 56 at 16. Thus, the Court grants partial summary judgment against Plaintiff's second and third alleged theories of recovery.

The County moves for summary judgment on Plaintiff's *Monell* claim on two grounds: (1) that Plaintiff offers no evidence that County policymakers were on notice of the alleged deficiencies, and (2) even if the County were on notice, Plaintiff fails to show that the County's conduct met the requisite mental state required to impose *Monell* liability.[9]

### a. Applicable Law

Section 1983 provides "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State" who "subjects, or causes to be subjected" any person within the jurisdiction of the United States the "deprivation of any rights, privileges, or immunities secured by the Constitution and the laws, shall be liable to the party injured." 42 U.S.C. § 1983. Although a municipality or other local government is a "person" who may be sued under § 1983, *Duarte v. City of Stockton*, 60 F.4th 566, 568 (9th Cir. 2023), it may not be held liable "for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In other words, § 1983 does not allow recovery for the actions of a local government's employees under a theory of *respondeat superior* liability. *Id.* at 691. Instead, a plaintiff must demonstrate that a municipality had a "policy" that was the "moving force" behind a violation of the plaintiff's constitutional rights. *See Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013); *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011).

---

[9] The County argues that the appropriate state of mind is the "reckless disregard" standard of *Gordon I*. That standard, however, was applied to individual defendants in *Gordon I*. The Supreme Court and the Ninth Circuit consistently apply the objective deliberate indifference standard in evaluating a municipal defendant's state of mind for *Monell* liability based on a policy of inaction or omission, such as failure to train and failure to implement. *See, e.g.*, *Connick v. Thompson*, 563 U.S. 51, 61-62 (2011); *City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *Hyun Ju Park v. City & County of Honolulu*, 952 F.3d 1136, 1141 (9th Cir. 2020); *Long v. County of Los Angeles*, 442 F.3d 1178, 1186, 1189 (9th Cir. 2006); *Oviatt ex rel. Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992).

To meet the "moving force" requirement, "the plaintiff must show both causation-in-fact and proximate causation." *Gravelet-Blondin*, 728 F.3d at 1096. A plaintiff can demonstrate causation-in-fact "only if the injury would not have occurred 'but for' [the defendant's] conduct." *Chaudhry v. Aragón*, 68 F.4th 1161, 1169 n.11 (9th Cir. 2023) (quoting *White v. Roper*, 901 F.2d 1501, 1505 (9th Cir. 1990)). In the context of *Monell* liability, a plaintiff can meet this burden by "establish[ing] that the injury would have been avoided had proper policies been implemented." *Long*, 442 F.3d at 1190 (quotation marks omitted). To demonstrate proximate causation, a plaintiff must establish that any "intervening actions were within the scope of the original risk and therefore foreseeable." *Van Ort v. Est. of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (quoting *Dodd v. City of Norwich*, 827 F.2d 1, 6 (2d Cir. 1987)).

"A 'policy' is a deliberate choice to follow a course of action made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (cleaned up). A plaintiff can show a "policy," as that term is used for *Monell* liability, "in one of three ways." *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 883 (9th Cir. 2022).

> First, the [municipality] may be held liable if it acted pursuant to an expressly adopted official policy. Second, the [municipality] may be held liable based on a longstanding practice or custom. Third, the [municipality] may be held liable if the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it.

*Id.* (quotation marks and citations omitted); *see also Connick v. Thompson*, 563 U.S. at 61 ("Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."); *Gordon v. County of Orange* (*Gordon II*), 6 F.4th 961, 973-74 (9th Cir. 2021) (describing the three ways "[a] plaintiff can satisfy *Monell's* policy requirement").

The Ninth Circuit recognizes that a local government body can be held liable under § 1983 for "policies" of inaction or omission. Some cases, generally older decisions, refer to this as a separate "path" to liability distinct from the "direct path" of the municipality *itself* violating the plaintiff's rights or directing its employees to do so.[10] *See Gibson v. County of Washoe*, 290 F.3d 1175, 1185 (9th Cir. 2002), *overruled on other grounds by Castro*, 833 F.3d 1060; *see also Tsao*, 698 F.3d at 1144. In this separate path to liability, a municipality can be held responsible "for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation." *Gibson*, 290 F.3d at 1185; *see also Tsao*, 698 F.3d at 1143; *Park*, 952 F.3d at 1141. More recent cases, however, generally describe claims for such policies of inaction or omission as a type of custom or practice claim. *See, e.g.*, *Sabra*, 44 F.4th at 884; *Gordon II*, 6 F.4th at 973. Regardless of how such claims are categorized, the Ninth Circuit is consistent in describing the heightened requirements that a plaintiff must show to prove a violation based on inaction or omission to avoid imposing *respondeat superior* liability.

A policy of inaction or omission may be based on a government body's "failure to implement procedural safeguards to prevent constitutional violations." *Tsao*, 698 F.3d at 1143; *see also Sabra*, 44 F.4th at 884. A plaintiff who alleges a policy of inaction, however, must establish that such a policy amounts to deliberate indifference to the plaintiff's constitutional rights. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997); *Park*, 952

---

[10] "Under [the] 'direct path' to municipal liability, a plaintiff must prove that the municipality acted with the state of mind required to prove the underlying violation, just as a plaintiff does when he or she alleges that a natural person has violated his federal rights." *Tsao*, 698 F.3d at 1144.

F.3d at 1141; *see also Oviatt*, 954 F.2d at 1474 ("To impose liability on a local governmental entity for failing to act to preserve constitutional rights, a section 1983 plaintiff must establish: (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." (quotation marks omitted)).

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (cleaned up). "Deliberate indifference exists when the need for more or different action is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Park*, 952 F.3d at 1141 (cleaned up). "This requires a showing that the facts available to the [municipality] put it on actual or constructive notice that its practices . . . were substantially certain to result in the violation of the constitutional rights of its citizens." *Sandoval*, 985 F.3d at 682 (cleaned up). Deliberate indifference ordinarily is shown through "a pattern of prior, similar violations of federally protected rights, of which the relevant policymakers had actual or constructive notice." *Park*, 952 F.3d at 1142. Deliberate indifference also may be shown if a policy is "so facially deficient that any reasonable policymaker would recognize the need to take action." *Id.* at 1141.

### b.  Failure to Implement

The County argues that Plaintiff provides no evidence that the County decisionmakers had notice of the alleged deficient policy nor a pattern of similar violations. Plaintiff, relying on *Castro*, argues that the County was on constructive notice that its conduct would likely result in constitutional violations because of an affirmative policy passed by the County. Plaintiff offers

PAGE 32 – OPINION AND ORDER

Washington County Sheriff's Office "Inmates with Disabilities" Jail Policy J-7-12 (Mansfield

Decl. Ex. 6, ECF 52-6), which Plaintiff contends is evidence that the County's policymakers had

constructive notice of the risk of the type of harm alleged by Plaintiff.

Plaintiff's reliance on *Castro*, however, does not address the threshold question related to

Plaintiff's failure-to-implement claim—whether the County had a *policy* of failing to implement

and enforce adequate policies and procedures regarding the needs of disabled inmates. Normally,

to prove a such a policy requires evidence of prior related incidents. The Ninth Circuit cautions

that a "single constitutional deprivation ordinarily is insufficient to establish" a practice or

custom. *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999); *see also Trevino v. Gates*, 99 F.3d

911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or

sporadic incidents[.]"). In *Castro*, the Ninth Circuit did not consider this question. The entity

defendants in *Castro* sought to argue on appeal that the plaintiff could not establish a policy

through custom or practice without proving prior incidents of harm. But the Ninth Circuit noted

that the entity defendants had failed to preserve this argument in the district court and thus had

waived the issue on appeal. 833 F.3d at 1074 n.7.[11]

---

[11] The Ninth Circuit also noted, in *dicta*, that even if the entity defendants had not waived
or forfeited the argument, it was legally incorrect that prior incidents of harm are necessarily a
prerequisite for finding custom or practice or deliberate indifference, citing *Brown*, 520 U.S.
at 409, for its holding that "evidence of a single violation of federal rights can, in some
circumstances, trigger municipal liability." *Castro*, 833 F.3d at 1074 n.7. That Supreme Court
discussion, as well as other Supreme Court and Ninth Circuit cases discussing the single
violation exception, involved failure to train, which is discussed below. *See Brown*, 520 U.S.
at 409 ("In leaving open in *Canton* the possibility that a plaintiff might succeed in carrying a
*failure-to-train claim* without showing a pattern of constitutional violations, we simply
hypothesized that, in a narrow range of circumstances, a violation of federal rights may be a
highly predictable consequence of a failure to equip law enforcement officers with specific tools
to handle recurring situations. The likelihood that the situation will recur and the predictability
that an officer lacking specific tools to handle that situation will violate citizens' rights could
justify a finding that policymakers' decision not to train the officer reflected 'deliberate

Because neither party's summary judgment briefing directly addressed the policy requirement for Plaintiff's failure-to-implement claim, the Court requested that the parties provide supplemental briefing on a discrete issue: whether evidence existed other than the single instance of Plaintiff's treatment to show the County's *policy* of failing to implement adequate procedures related to disabled individuals in the Jail. Both parties timely filed supplemental briefs. *See* ECF 86; ECF 87.

Plaintiff argues in his supplemental brief that the Supreme Court and the Ninth Circuit do not always require another instance of a constitutional violation for a finding of *Monell* liability, citing *City of Canton v. Harris*, 489 U.S. 378 (1989), *Flores v. County of Los Angeles*, 758 F.3d 1154 (9th Cir. 2014), *Castro*, and *Sandoval*. These cases do not support Plaintiff's position because they do not address the crux of the Court's inquiry, which relates to the requirement that Plaintiff must show an unconstitutional policy to pursue a failure-to-implement *Monell* claim.

*City of Canton* was decided in the failure-to-train context, for which the Supreme Court noted a potential exception related to proving a claim with a single instance of a constitutional violation, as will be discussed further below. The Supreme Court subsequently discussed *City of Canton*'s single-instance exception as being in the failure to train context. *See Brown*, 520 U.S. at 409. Thus, *City of Canton* does not support the conclusion that Plaintiff may maintain a failure-to-*implement* claim absent a showing that the County had a policy of failing to implement adequate procedures.

Additionally, the Ninth Circuit in *Castro* did not analyze how a plaintiff could prove the policy requirement, concluding that the municipal defendants had waived such arguments before

---

indifference' to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right." (emphasis added)).

the district court. 833 F.3d at 1074 n.7. *Flores* acknowledged the single-instance exception in the

failure-to-train context but determined that the exception had not been satisfied. 758 F.3d

at 1159-60. Finally, the Ninth Circuit in *Sandoval* did not reach the single-instance exception

because it was satisfied that the evidence before the court was "sufficient to allow a jury to find

that the County *had an established practice* of using . . . a mixed-use cell without the safeguards

necessary to ensure that the jail's medical staff knew when an inmate held there required medical

treatment or observation." 985 F.3d at 681 (emphasis added). Although *Sandoval* was decided in

the context of a single harmed plaintiff, the plaintiff in that case sufficiently established that the

municipality had an actionable policy, shown through the practice or custom of placing inmates

in mixed-use cells without adequate medical safeguards. Here, in contrast, Plaintiff fails to

provide to the Court evidence of a practice or custom that is deliberately indifferent to inmates'

constitutional rights. Accordingly, the Court grants summary judgment in favor of the County on

Plaintiff's failure-to-implement *Monell* claim.

### c.  Failure to Train

The County argues that Plaintiff cannot establish *Monell* liability under a failure-to-train

theory. "Failure to train may constitute a basis for *Monell* liability where the failure amounts to

deliberate indifference to the rights of those who deal with municipal employees." *Benavidez v.*

*County of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (citing *Canton*, 489 U.S. at 388-89).

Under narrow circumstances, a municipality's failure to train its employees may be considered a

policy or custom. *See Canton*, 489 U.S. at 389. Under a failure-to-train theory, a plaintiff must

provide evidence "(1) of a constitutional violation; (2) of a municipal training policy that

amounts to a deliberate indifference to constitutional rights; and (3) that the constitutional injury

would not have resulted if the municipality properly trained their employees." *Benavidez*, 993

at 1153-54. "A [municipality's] failure adequately to train its employees to implement a facially

valid policy can amount to deliberate indifference." *Long*, 442 F.3d at 1188. "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quoting *Brown*, 520 U.S. at 409). Absent a pattern of similar violations, failure to train "may amount to a policy of deliberate indifference if the need to train was obvious and the failure to do so made a violation of constitutional rights likely." *See Dougherty*, 654 F.3d at 900 (quotation marks omitted).

The County does not contest that Plaintiff suffered a constitutional injury. As to the second element of the failure-to-train analysis, the County argues that Plaintiff cannot establish that the County's failure to train amounted to deliberate indifference because the County lacked actual or constructive notice that its training program was inadequate. The County also argues that Plaintiff provides no evidence that a lack of training caused Plaintiff's injuries.

For the second failure-to-train element, Plaintiff does not offer evidence of a pattern of similar violations caused by the County's failure to train. Thus, Plaintiff must establish that the County's failure to train was so obviously likely to lead to the constitutional violation that the omission reflects the County's deliberate indifference.[12] In other words, Plaintiff must offer

---

[12] The County argues that the County's decisionmakers lacked actual or constructive notice of the risk of harm suffered by Plaintiff. It is true that "without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62. In the specific context of a *Monell* failure-to-train claim based on a showing of obviousness, however, it would make little sense to require an *additional* showing of notice. In other words, the obvious nature of the training deficiency serves as constructive notice for purposes of *Monell. See, e.g.*, *Wereb v. Maui County*, 830 F. Supp. 2d 1026, 1032 (D. Haw. 2011) ("Disregarding 'a known or obvious consequence' means 'city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional right[.]'" (quoting *Connick*, 563 U.S. at 62) (alteration in *Wereb*)).

evidence that "a violation of federal rights [was] a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *See Brown*, 520 U.S. at 409.

Plaintiff points to evidence surrounding the County's failure to train the Jail's employees in accordance with Jail Policy J-7-12. Specifically, Plaintiff highlights the deposition testimony of the Jail's ADA coordinators. Corporal Wiley was the ADA coordinator for the Jail from March 2017 to February 2018. Wiley Dep. Tr. 8:4-12 (Walsh Decl. Ex. 4, ECF 57-4). Corporal Wiley testified that upon her appointment to the position of ADA coordinator she was not provided a written position description describing her duties. *Id.* at 17:22-25. In response to a question about who provided ADA training to the Jail's staff, Corporal Wiley first testified that there "was no training provided" to jail staff during her tenure as ADA coordinator. *Id.* at 21:2-12. Corporal Wiley then corrected her statement, indicating that during her one-year tenure as ADA coordinator she conducted one training with jail staff on assistive technologies. *Id.* at 21:18-24. Corporal Wiley confirmed that the Jail's policy for requests for disability-related footwear accommodations was that such requests must be "done through medical." Wiley Dep. Tr. 18:18-19:4 (Mansfield Decl. Ex. 3, ECF 52-3). Corporal Wiley testified that she was not responsible for ensuring that NaphCare was abiding by the ADA and that she did not know if anyone employed by the County reviewed NaphCare's policies to make sure that those policies complied with the ADA. Wiley Dep. Tr. 27:3-19 (Walsh Decl. Ex. 4).

Candice Plewik took over the role of ADA coordinator for the Jail in March 2018. *Id.* at 8:10-12. Ms. Plewik testified that she was unaware of the ADA and had not received any ADA-related training before her appointment to the ADA coordinator role. Plewik Dep. Tr. 18:11-22 (Walsh Decl. Ex. 5, ECF 57-5). Like Corporal Wiley, Ms. Plewik did not receive a

written position description explaining the duties of an ADA coordinator. *See id.* at 28:11-18. The only training Ms. Plewik received as the incoming ADA coordinator was four hours of training with Corporal Wiley. *Id.* at 27:24-28:10. Ms. Plewik testified that she was not familiar with NaphCare's policies and procedures for disabilities and that she did not believe it was her responsibility to ensure that NaphCare was abiding by the ADA. *Id.* at 44:8-16. Ms. Plewik did not know who was responsible for ensuring NaphCare's compliance with the ADA. *Id.* at 44:17-25.

Plaintiff also submits evidence that, despite NaphCare's responsibility to oversee medical accommodations under the Jail's policy, NaphCare employees were untrained and uninformed about their duties under the ADA. NP Rojo, a NaphCare employee, testified in her deposition that she lacked an understanding about what the ADA was and that she was unaware of any rules that she was required to follow regarding the ADA while working at the Jail. Rojo Dep. Tr. at 15:7-14. In response to a question about Plaintiff's requests for shoes, NP Rojo testified: "I never authorize shoes to anyone. Because it was told to me when I joined the jail, in general, if shoes are needed for a person, those are verified by the in-take nurse." *Id.* at 17:14-17. When asked whether she had ever seen the Aids to Impairment policy (NaphCare's policy for requests for medical accommodations) before the deposition, NP Rojo replied "No, I have not." *Id.* at 37:22-24.

Plaintiff offers evidence that the County effectively failed to train its ADA coordinators, failed to ensure adequate training of the Jail's staff, and failed to oversee NaphCare's compliance with the ADA. Plaintiff also provides evidence that NaphCare did not train its employees on how to comply with the ADA. The County may not "contract away" its statutory and constitutional obligations to NaphCare and is thus responsible for NaphCare's inadequacies. *Castle*, 731

F.3d at 910; *West v. Atkins*, 487 U.S. 42, 56 (1988) ("Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical care to those in its custody[.]").

Plaintiff thus challenges the substance of the County's training program rather than the particular training format. *See Connick*, 563 U.S. at 68 ("[F]ailure-to-train liability is concerned with the substance of the training, not the particular instructional format."). Plaintiff offers evidence that the County provided no training to its agents, as required under its own policies, and that the County's agents lacked any knowledge of their duties. The County's agents were operating almost in the complete absence of training about their responsibilities to disabled individuals in the Jail. These facts, viewed in the light most favorable to Plaintiff and drawing inferences in his favor, create a fact question for the jury about whether the County's failure to train demonstrates deliberate indifference under *Monell*. A jury could find that a violation of Plaintiff's federal rights was a "highly predictable consequence" of the County's failure to train and equip its Jail employees and medical contractors with specific tools to handle recurring situations related to accommodations for disabled individuals. A jury could find that the County's failure to train demonstrated a conscious disregard of the substantial likelihood of harm, thereby satisfying the deliberate indifference requirement for *Monell* liability against the County.

Finally, for the third element of the *Monell* failure-to-train analysis, Plaintiff must show that the County's failure to train was the "moving force" behind the constitutional violation. *See City of Canton*, 489 U.S. at 389. To meet this requirement, as noted above, "the plaintiff must show both causation-in-fact and proximate causation." *Gravelet-Blondin*, 728 F.3d at 1096. A jury could find that Plaintiff's alleged constitutional injury, inadequate medical care in violation

of Plaintiff's due process rights under the Fourteenth Amendment, is directly traceable to the denial of a reasonable accommodation in violation of the ADA and the subsequent physical injury that Plaintiff suffered. A jury also could find that Plaintiff's injury was a foreseeable result of the County's failure to train. Thus, the Court finds that there is sufficient evidence of causation to preclude summary judgment on Plaintiff's *Monell* claim for failure to train against the County.

### d. Conclusion

The Court finds that Plaintiff offers sufficient evidence to preclude summary judgment on Plaintiff's *Monell* claim against the County under a failure-to-train theory. Plaintiff may proceed to trial on the failure-to-train claim. Plaintiff does not offer sufficient evidence to preclude summary judgment on a failure-to-implement theory, and accordingly, the Court grants summary judgment for the County on that theory.

### 4. Common Law Negligence Claims

Plaintiff asserts a claim for common medical negligence against NaphCare and the County. Plaintiff alleges that the agents and employees of NaphCare and the County were negligent by failing to provide Plaintiff with his personal shoes or other appropriate protective footwear, and by failing to appropriately treat his ankle injury.

Under Oregon law, a plaintiff who brings a claim for professional negligence "must allege and prove the following: '(1) a duty that runs from the defendant to the plaintiff; (2) a breach of that duty; (3) a resulting harm to the plaintiff measurable in damages; and (4) causation, *i.e.*, a causal link between the breach of duty and the harm.'" *Smith v. Providence Health & Servs.—Or.*, 361 Or. 456, 460 (2017) (quoting *Zehr v. Haugen*, 318 Or. 647, 653-54 (1994)).

"It is well established under Oregon law that, '[i]n most medical malpractice cases, expert testimony is required to establish the standard of care.'" *Thorson v. Bend Mem'l Clinic*, 291 Or. App. 33, 36 (2018) (quoting *Trees v. Ordonez*, 354 Or. 197, 207 (2013) (alteration in *Thorson*); *see also Getchell v. Mansfield*, 260 Or. 174, 179 (1971) ("In most charges of negligence against professional persons, expert testimony is required to establish what the reasonable practice is in the community."). "The rationale behind that rule is that a layperson typically would not know what an 'ordinarily careful' [medical professional] would do under the circumstances." *Trees*, 354 Or. at 207; *see also Getchell*, 260 Or. at 179 (explaining that the reason for that rule is "reasonable conduct for a professional is ordinarily not within the knowledge of the usual jury"). "[I]f the jury is capable of deciding what is reasonable conduct without assistance from an expert medical witness no expert testimony is necessary to establish the standard of care." *Getchell*, 260 Or. at 179-80. An example of the latter includes that "a jury could find a surgeon was negligent without the assistance of expert medical testimony if the surgeon operated without sterilization of his instruments." *Id.* at 180. The Oregon Supreme Court has "reject[ed] a rule requiring expert testimony from a medical doctor" and accepted "testimony from a qualified expert, who has knowledge about the standard of care that is helpful to the trier of fact." *Trees*, 354 Or. at 211 (addressing evidence required for a plaintiff to survive a motion for directed verdict on the issue of negligence in a medical malpractice case).

NaphCare argues that summary judgment is appropriate because Plaintiff offers no admissible expert evidence that establishes a breach of the standard of care and causation. The County joins NaphCare's motion as to Plaintiff's negligence claim and relies on the same argument—that Plaintiff cannot prevail because his only expert witness is unqualified to testify about the standard of care in a correctional setting. The Court rejected this argument in denying

NaphCare's motion to exclude NP Harris's testimony. Thus, the Court denies summary judgment on Plaintiff's negligence claim.

## CONCLUSION

To summarize, the claims that remain for trial are: (1) Plaintiff's ADA and Rehabilitation Act claim against the County for denial of medical services from April 27, 2018 to May 17, 2018; (2) Plaintiff's individual § 1983 claim against NP Rojo; (3) Plaintiff's § 1983 *Monell* claim against the County for failure to train; and (4) Plaintiff's negligence claim against NaphCare and the County.

The Court GRANTS IN PART and DENIES IN PART Defendants' Motion to Exclude Expert Testimony (ECF 72, ECF 74) as described herein. The Court GRANTS IN PART and DENIES IN PART NaphCare and NP Rojo's Motions for Summary Judgment (ECF 49). The Court GRANTS IN PART and DENIES IN PART the County's Motion for Summary Judgment (ECF 51).

**IT IS SO ORDERED**.

DATED this 25th day of January, 2024.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge